# The Spring Brook Railway Company, Appellant, *v.* The Lehigh Coal & Navigation Company.

*Mortgage—Lease—Corporation—Accounting.*

A corporation mortgaged and also leased its property to another corporation which was to go into possession and to apply the gross receipts to the payment of taxes, certain liens and the mortgage debt of the lessor to the lessee. The lessee sublet the property to another company. The lessee did not keep a detailed and itemized account, such as the lessor was entitled to, but the sublessee did so in regard to nearly all essential matters. The lessor complained from time to time of the inadequacy of the accounts, but made no effort to get the details when they were current and accessible, and afterwards, when an opportunity was given to examine the lessee's books, failed to take advantage of it. The lessor filed a bill in equity for an account and to prevent the lessee from proceeding upon its mortgage. *Held*, that as it was possible to state an account, the lessee was not entitled to an injunction to restrain proceedings upon the mortgage.

Where a business is conducted by one who is not the exclusive owner, but is accountable in part as a quasi trustee to another, the business must be conducted with fair regard to the interests of both parties, and equity will scrutinize closely where there is any reason to suspect fraud, or even any opportunity for unfair advantage; but where the interests of both parties are the same, there is a presumption that the best was done by the party conducting the business which the circumstances permitted.

A railroad company mortgaged and leased its property to another corporation under an agreement that the lessee "may charge for transportation on the said railroad and its branches any such rates as may be lawful and as may seem best to it for its own interest," and shall set aside twenty per cent of the gross receipts for payment of the taxes, liens, etc., and the reduction of the mortgaged debt. The lessee sublet the road to a lumber company, and instead of reserving rent at a percentage of actual gross earnings, it substituted a fixed rate per ton of freight carried. It appeared that the leased road was a short road used principally for the development of lumber territory, that the territory was nearly exhausted, and that the lumber which was left was mainly controlled by the lumber company which threatened to build another road. *Held*, (1) that there was a strong presumption that the lessee was using its best judgment not only for its own interest, but for the interest of the lessor; (2) that if the lessor was injured at all, it was amply compensated by the action of the master and the court below in increasing the rate from thirty cents to eighty-five cents per ton as a proper charge for what the lessee should have received from the lumber company.

Argued Feb. 23, 1897. Appeal, No. 527, Jan. T., 1896, by plaintiff, from decree of C. P. Lackawanna Co., June T., 1892,

No. 9, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, MCCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account and for an injunction.

The case was referred to Charles L. Hawley, Esq., as master.

On exceptions to the master's report, GUNSTER, J., filed the following opinion by which the facts appear:

The principal questions in this case are, whether the plaintiff is entitled to an account from the defendant, and if so, what the state of the account between the parties is. In the opinion filed February 4, 1895, we decided that the defendant was mortgagee, in possession of the property of the plaintiff, under an agreement to set aside twenty per centum of the gross receipts for transportation for the purpose of paying certain specific charges and debts, including the mortgage debt; that it was bound to account for these receipts and that it had not yet accounted for them, and that an account should be taken of all the dealings and transactions between the plaintiff and the defendant, as well prior to May 1, 1889, as subsequent thereto, and, therefore, in pursuance of the agreement of the parties, on the 5th of June, 1895, the present master was appointed to state the account between them. The report of the master, with sixteen exceptions thereto on part of the plaintiff and thirty-five exceptions thereto on part of the defendant, is now before us. The report consists of two parts, the second part being called an " alternative " report.

In the first part of the report the master, after ruling out certain evidence, in substance finds and reports as matter of fact and law that the defendant has not accounted to the plaintiff as contemplated by the law and the parties; that it is unable to do so; that its inability to do so grows out of its failure to keep correct and detailed accounts of its transactions and its failure to properly prepare itself and keep itself prepared for the stating of such account, and that its attempt to collect anything at all by means of the mortgage given by the railroad company to it, or any judgment obtained under said mortgage, should be restrained by this court, and that the defendant should pay the costs. In order to avoid the necessity of returning the report,

in case this conclusion should be found to be incorrect, he makes the " alternative " report, wherein, after admitting certain evidence at first ruled out, and discussing the principal item with which the defendant is to be charged,. and giving his reasons for the rates charged, he states an account between the parties in debit and credit form, and finds that there is due the defendant from the plaintiff from the mortgage in question the sum of $11,217.34, with interest from June 1, 1892.

We are unable to accept the conclusion reached by the learned master in the first part of his report. In our opinion it is based on fundamental error. We see no reason why the mortgagee should be restrained from proceeding on his mortgage without some proof that the debt has been paid.

It appears that on the 6th of October, 1874, the plaintiff executed and delivered to the defendant a mortgage on its railroad, franchises, equipments, etc., to secure a loan of $15,000. Default was made in some of the payments as they became due and on the 1st of October, 1882, the principal and interest due thereon amounted to $19,336.78. On the 4th of October, 1882, the plaintiff entered into an agreement with the defendant, in which it leased the railroad and franchises covered by the mortgage to the defendant, in order that the defendant might operate said railroad in its own interest and for the purpose of repaying to itself the principal and interest of the mortgage loan and to preserve to the plaintiff the charter under which its railroad was built. By the terms of this agreement the defendant was authorized to charge for transportation such rates as might be lawful and as might seem best to it for its interests, and was required to set aside of such sums as it might receive for transportation, twenty (20) per centum of the gross receipts for the purpose of paying : 1st, taxes ; 2d, claims in the nature of liens on the property which might exist or accrue ; 3d, the indebtedness consisting of said mortgage loan with interest to October 1, 1882, and such money as might be spent by the defendant in. putting said road in repair up to December 1, 1882, and such moneys as might be spent in making extensions of the road and in purchasing equipments therefor from time to time. It further appears that under this agreement the defendant took possession of the railroad and made repairs ; that on the 1st of January following it sublet as from October 1, 1882, the prop-

erty to the Central Railroad of New Jersey which operated it
for about eight months, when it was transferred to the Phila-
delphia & Reading Railroad Company, which operated it until
the spring of 1885, when the defendant sublet it to the Spring
Brook Lumber Company as of March 1, 1885, which operated
it until the defendant terminated the agreement with the plain-
tiff in May, 1892.   These facts are not disputed.

It further appears that no account was ever stated or settled
between the parties.   The master says in one part of his report
that the defendant has accounted, but I do not understand him
to use the word, "accounted" in the sense contemplated by
the bill.   A stated account properly exists only where accounts
have been examined, and the balance admitted as the true bal-
ance between the parties, without having been paid.   When
the balance, thus admitted, is paid, the account is deemed a
settled account: Story's Equity Pleadings, 8th edition, sec. 798.

In May, 1889, the defendant, in response to a request from
counsel for plaintiff, sent him a statement of what it claimed to
be the account, but this was not acquiesced in by the plaintiff
and it never agreed to it or to the balance therein stated to be
due.

It further appears that the defendant kept no detailed ac-
counts showing the gross receipts of the railroad.   Reports
were made to it monthly by the respective operating companies,
showing the total amount of what they considered the gross
receipts of the road for each month.   It credited the plaintiff
with twenty per cent of these gross receipts so returned to it
and applied the same on the indebtedness of the plaintiff as
provided by the agreement.

The learned master seems to be of the opinion that the de-
fendant ought not to be permitted to collect anything on its
mortgage, because it has not itself kept detailed accounts of
the gross receipts.   This we think is error.   Neither its right
to proceed on its mortgage, nor its ability to account depends
on its keeping these accounts itself.   It is an undisputed fact
that on the 4th of October, 1882, the plaintiff owed it $19,336.78
on the mortgage.   It ought to be permitted to collect such part
of this amount as still remains unpaid.   It is undoubtedly bound
to account.   It attempted to show what the state of the account
is.   If it has failed to do so, or if it has failed to keep such

accounts as would enable it to do so, the plaintiff had the undoubted right to show what the account ought to be, and to show that its indebtedness is paid, but I do not understand how its failure to keep detailed accounts of the gross receipts, or its failure to state the account correctly can raise a conclusive presumption of payment.

While the defendant itself did not keep detailed accounts the different companies which operated the road under it did, except as will be presently pointed out. This appears very clearly from the testimony of G. F. Anthony, W. L. Anthony and John A. Gillick. Unfortunately the books covering the period prior to the time when the lumber company began to operate the road were burned, but the parties who kept them and who had charge of the office at Moosic, and who sent the reports to the defendant, testify that the reports were made from the books and accounts kept and that the monthly returns were correct. The books of the lumber company were in the building where Mr. Gillick was examined and when the original reports made from them were offered in evidence.

This brings us to the consideration of the evidence and facts from which this account between the parties is to be stated. The master properly starts out with charging the plaintiff with the amount of the debt and interest received by the mortgagor. He then charges it from time to time with interest, expenditures for repairs, equipments, etc., as authorized by the agreement between the parties. The only item in these charges to which any exception has been taken is the charge of December 1, 1882, of $6,088.02 for repairs of road to date. It is alleged that there is no competent evidence to support this finding. A reference to the 3d clause of the 4th article of the agreement, however, shows that the indebtedness contemplated by the parties included "such moneys as may be spent by the party of the second part in putting said road in repair up to December 1, 1882." A reference to the testimony of Mr. Harris, president of the defendant company, shows that the repairs were made and Mr. Howell, the auditor of the company, testifies that that amount was paid for them. The master's criticism as to this charge in one item is hardly sustained by the evidence. Mr. Howell, who testified to this charge, was examined in the office of the company at Philadelphia, where the books of the company

were and, when asked by counsel for plaintiff whether the company had any other account than that given in the answer which showed a fuller statement of the business relations between the parties, testified that this charge was shown in detail on the company's book and that it would take considerable labor to get at the detail of it and explain it in the testimony, and he was not asked further details and the books were not called for when the item was being proved.

Running along contemporaneously with the charges against the plaintiff the master from time to time gives it credit for the valuation of the equipment, twenty per centum of what he estimates to have been the gross receipts, less taxes, etc.

It appears that under the second article of the agreement an inventory was made of the equipment, material, shop and road tools of the plaintiff on the 1st of October, 1882.   On the inventory the defendant placed a valuation of $1,450.48.   Included in this inventory was a locomotive which it valued at $500. The plaintiff claims that this was $500 too low, and there is evidence to show that it was worth that much more.   Both masters have reported in favor of charging on this inventory the $500 more claimed by the defendant, and while they might have found the other way, I see no good reason under the evidence for substituting my opinion on that question for theirs.

The second matter for which credits are allowed by the master consists of gross receipts, and this is unquestionably the bone of contention in the case.   It is provided in article 4 of the agreement of October 4, 1882, that " the party of the second part may charge for transportation on the said railroad and its branches any such rates as may be lawful, and as may seem best for its interest, and shall set aside of such sums as it may receive for transportation, twenty (20) per cent of the gross receipts, for the purpose of paying " taxes, liens and the indebtedness of the plaintiff, etc.

It is alleged on the part of the defendant that it has given plaintiff credit for twenty per cent of the gross receipts of the road, and that there is still a balance of about $30,000 due it, while the plaintiff alleges that it has not received credit for twenty per cent of the gross receipts, and that in addition to the amount which the defendant credits it with, the defendant received other and larger amounts, and could and should have

received larger amounts of gross receipts, and it contends that the defendant should account not only for the amounts which it actually received but also for such amounts as it could and should have received. The standard of duty imposed upon the defendant by the agreement of October 4, 1882, does not differ materially, from that imposed on the usual mortgagee in possession. It is bound to account not only for what it actually received but also for what it should and could with reasonable care and attention, have received: 2 Daniell's Ch. Pl. & Pr. 1236, 1237, 1238; 4 Kent's Commentaries, 166; Murdock v. Clark, 59 Cal. 683; 15 Am. & Eng. Ency. of Law, 821, note 3. While the agreement provides that the defendant might charge such rates as might be lawful and as might seem best to it for its interests, the spirit of the agreement was that the road should be operated in the interest of both parties. So far as the amount of money which the defendant actually received is concerned there is no conflict in the evidence, but as to the amount of gross receipts which it could and should have received for the greater period during which the road was in its control, the evidence is conflicting. The defendant appears to have treated only the amount of money which it received as a percentage of the receipts, and gave the plaintiff no credit for money received for passenger fares, or freight carried by the operating company for which no charges were made, and only such rates as the operating company saw fit to charge itself with for its own transportation, regardless of what the same was worth. Gross receipts are all receipts had, undiminished by expenses or other deductions (Anderson's Law Dictionary), and the gross receipts contemplated by the agreement were the gross receipts of the road and not what the defendant received from the parties operating the same.

When the defendant took charge of the road the plaintiff had a schedule of rates. The plaintiff endeavored to show that it was agreed that this schedule should be maintained, or rather that the rates fixed thereby should not be lowered, but the evidence is entirely inadequate to change the terms of the agreement as evidenced by the writing itself. From October, 1882, to March, 1885, while the Central Railroad Company of New Jersey and the Philadelphia and Reading Railroad Company were operating the road this schedule was substantially followed

and there is evidence that during that period the gross receipts should or could have been larger than reported. As already said these reports or returns were made. from the books and accounts kept by the operating companies as appears from the testimony of G. F. Anthony and his son, and identified by Mr. Howells and Mr. Fields. From these returns, the correctness of which is not questioned by the evidence, the master has made computations showing the gross receipts during said time and in the account as stated by him he gives the plaintiff credit for twenty per cent thereof as provided by the agreement.

From March 14, 1885, until the defendant terminated the agreement, that is, while the Spring Brook Lumber Company operated the road, a different state of affairs is disclosed by the evidence. It appears that on the 11th of March, 1885, the defendant agreed with one Albert Lewis to make a lease to the lumber company for the whole of the unexpired term of its own lease upon the terms that the lumber company "shall take and operate the said railway wholly at its own cost and risk, and shall pay to the Lehigh Coal & Navigation Company ten (10) cents per ton for every ton of freight which shall pass over any part of the said railway from or to Moosic Station, being one-third of the gross earnings of the said railway, which for the purpose of this agreement are reckoned at thirty (30) cents per ton." In pursuance of this agreement the defendant did lease said road as from March 14, 1885, to the lumber company, and in the said agreement it was provided that "The Spring Brook Lumber Company shall and will pay to the Lehigh Coal and Navigation Company ten (10) cents per ton for every ton of freight which shall pass over any part of the said railway from or to Moosic Station, and five (5) cents per ton for every ton of freight which shall pass over any part of the said railway without reaching or passing Moosic Station and shall be delivered to parties other than the Spring Brook Lumber Company."

It will be observed that this agreement with the lumber company makes no reference to gross receipts. It provides only for the payment of charges for a part of the freight carried and the rate or charge on that is fixed absolutely. It makes no provision for the payment of any part of the receipts arising from passenger traffic, and under its terms, at least that part of the

freight which was carried and delivered to the lumber company without reaching or passing Moosic station, was free of charge. Assuming that the amount which the lumber company was bound to pay it was one third of the gross receipts, the defendant gave the plaintiff credit only for twenty per cent of the amount reported or returned from time to time by the lumber company. This was wrong. It is true, in their agreement with Lewis the rate of ten cents per ton for freight was stated to be one third of the gross earnings of the railroad, and that for the purposes of that agreement the rate of thirty cents per ton was assumed to be the gross earnings of the road. As between the parties to that agreement this assumption may have been conclusive and the rate fixed by the agreement with the lumber company no doubt was so, but this plaintiff was not a party to either of these agreements, and it is not bound by what the defendant and the lumber company assumed to be the gross receipts.

The evidence shows that large sums were received from time to time for the transportation of passengers; that the lumber company transported some of its own freight without making any charge therefor; that for some freight only nominal charges were made and that most of its freight was transported at rates much lower than those charged to other parties. It further shows that much of the freight transported over the road belonged to the lumber company itself, and that in operating the road it was its own and best customer.

Whatever may have been the agreement between the defendant and the lumber company, so far as the plaintiff is concerned the lumber company was acting under the authority conferred by the defendant. Bearing in mind that the plaintiff had expended large sums of money in constructing and equipping its road, that it was charged with the expense of repairs to December 1, 1882, as well as the expenses incurred in extending and equipping the road, and that their indebtedness and the expense mentioned should be paid out of the gross receipts of the road, it would be unjust to permit the defendant or those operating the road under it to transport freight or passengers free of charge, or at nominal rates, or at rates less than they were fairly worth without accounting for the fair value thereof.

During the trial of the case the defendent virtually conceded

the plaintiffs' claim for the contract proportion of the receipts from passenger traffic, and the master has given the plaintiff credit for the same. But the amount to be credited for transportation of freight is still contested by it, and the ascertainment of the proper amount is involved in some difficulty. This arises from the evidence, or rather the lack of evidence. This was in my mind when it was decided that an account should be taken and leave was given the parties to read the evidence already taken so far as the same was competent and relevant. The master urged the parties to submit further and more particular evidence concerning the items of debit and credit, but they contented themselves with submitting the testimony already taken, and, without argument, left the master to state the account as best he could, and, after a careful examination of the evidence before him, he concluded that the defendant should be charged at the average rate of 85 cents per ton for every ton of freight shipped while the lumber company operated the road. He was virtually compelled to ascertain an average charge because the evidence does not show in detail for whom the freight was carried or what the actual rates received were. He has prepared and reported tables showing from month to month and year to year, while the lumber company operated the road, the number of tons of freight transported over the road, the gross amount received from parties other than the lumber company for the transportation of freight, and also the gross receipts from the passenger traffic. He has also prepared and reported a table showing how much the gross amounts so received for freight would average per ton on the whole number of tons of freight transported. This shows that for the period ending October 1, 1885, the average rate per ton was 77 cents ; from October, 1885, to October, 1886, it was 56½ cents ; from October, 1886, to October, 1887, it was 46½ cents ; from October, 1887, to October, 1888, it was 45 cents ; from October, 1888, to October, 1889, it was 37 cents ; from October, 1889, to October, 1890, it was 29½ cents ; from October, 1890, to October, 1891, it was 33½ cents ; from October, 1891, to June, 1892, it was 35¼ cents. It must be borne in mind that the tonnage includes the lumber company's own freight and that no charges for the same are allowed in the gross receipts for freight. Up to April, 1885, there had been a schedule of rates, which was substantially adhered to,

but when the lumber company took charge of the road it charged about what it liked to others, and nothing to itself. Up to October, 1885, they did not carry so much of their own freight, but after that the proportion increased rapidly and this readily accounts for the rapid fall in the rate per ton. There is also evidence showing that the number of cars transported was 8,556 and that for at least some of the cars as high as $15.50 was charged. In some instances Dale & Co. were charged more. They, however, were charged unusually high rates because they had exacted an exorbitant amount from the company for a right of way. While the average rate for the first period of six months or so is only 77 cents per ton, some allowance must be made for the lumber company's own freight which entered into the tonnage, but for which nothing is charged in the gross receipts. After carefully considering the evidence, we see no reason for disturbing the master's conclusion as to the rate to be charged for the whole time the lumber company operated the road. It is as fair a conclusion as any other, and is, we think, a legitimate inference from the evidence before us.

While the exceptions filed by the respective parties have not, so far, been discussed, it is proper to state that they were all duly considered before the conclusions above stated were reached, and I believe that our reasons for disposing of them as we do, are indicated with sufficient clearness to avoid the necessity of discussing them in detail. . . .

We are of opinion that the recommendation made by the master that the defendant be restrained from its attempt to collect anything on its mortgage should be disregarded; that the account between the parties as stated by the master in his alternative report should be approved, that the balance due by the plaintiff to said defendant on said account, and being the balance due on said mortgage is $11,217.34 with interest from June 1, 1892, and that on payment of said amount by the plaintiff to the defendant the defendant should satisfy said mortgage of record and surrender to the plaintiff the stock pledged as collateral security, and that the defendant should pay the costs.

### DECREE.

Now, September 29, 1896, this cause came on to be heard, and was argued by counsel, and thereupon upon consideration

thereof, it is ordered, adjudged and decreed as follows, to wit: That the account between the parties as stated by Charles L. Hawley, Esq., master, in his alternative report, be approved, that the balance due by the plaintiff to the defendant on said account, and being the balance due on the mortgage given by the plaintiff to the defendant bearing date October 6, A. D. 1874, is the sum of eleven thousand two hundred seventeen and thirty-four hundredths dollars ($11,217.34), with interest thereon from June 1, 1892, and on the payment of said amount by the plaintiff to the defendant the defendant shall satisfy said mortgage of record and surrender to the plaintiff the stock pledged as collateral security, and the defendant shall pay the costs of this proceeding.

*Errors assigned* were in overruling exceptions to the master's report.

*S. B. Price,* with him *E. C. Newcomb,* for appellant.—Where a party is required to bring in his account before the master he must produce the whole account for the whole period for which he is accountable: Story v. Brown, 4 Paige, 112; 2 Daniell's Chancery, Pl. & Pr. 1222.

A mortgagee in possession is bound to account for the rents and profits; and on proof of his refusal to account, a jury should make every presumption against him that the evidence will warrant: Reitenbaugh v. Ludwick, 31 Pa. 131; Bockius's Est., 28 W. N. C. 312; 2 Daniell's Chancery Pleading & Practice, 1238; 4 Kent's Com. 166; 2 Pomeroy's Eq. Jurisp. sec. 1218.

An account should be kept, if for no other purpose, to indicate accuracy and good faith: 2 Lewin on Trusts, 860; 2 Pomeroy's Eq. Jurisp. secs. 1058, 1063.

If a mortgagee in possession has not kept proper accounts he is chargeable with what he might have received: 15 Am. & Eng. Ency. of Law, 821; Dexter v. Arnold, 2 Sumn. 108; Van Buren v. Olmstead, 5 Paige, 9; Clark v. Smith, Saxt. 121; Montgomery v. Chadwick, 7 Iowa, 114; Richardson v. Wallis, 5 Allen, 78.

*Everett Warren* and *Samuel Dickson,* with them *Henry A. Knapp,* for appellee.—We do not deny the obligation of the

tenant to account for rents and profits. In the absence of gross negligence, however, even a mortgagee in possession is only compelled to account for such rents as he has received, or if he is occupying the premises himself then to account for a reasonable rent for such occupancy: 4 Kent's Commentaries, 166 ; Moore v. Degraw, 5 N. J. Eq. 346 ; Scruggs v. Memphis & Charleston R. R., 108 U. S. 368 ; Reitenbaugh v. Ludwick, 31 Pa. 131.

OPINION BY MR. JUSTICE MITCHELL, May 24, 1897 :

This is a bill for an account, an injunction and other relief by the appellant against its mortgagee and lessee, which was in possession under a lease reserving a rent of twenty per cent of the gross receipts of the road, to be applied to the payment of taxes, certain liens, and the debt of the lessor to the lessee. The duty to account is not denied but the defendant claims that it has from time to time during the running of the lease accounted fully. On this point the master found in favor of the appellant, and holding that there had not only been no such accounting as the law required, but also that the defendant had failed to keep such books as enabled it now to account fully, he reported that the defendant should be enjoined from proceeding on its mortgage. Recognizing however, that this was as he describes it himself, a "radical position" which the court might not approve, the master presented also an "alternative report" in which the evidence is gone over with great care and skill, and an account stated, in which the amount due from appellant to defendant is fixed at $11,217.34, a little more than one third of the sum claimed by the defendant.

The court below declined to approve the master's first recommendation, and adopted the alternative report. This action is the most important error alleged by the appellant. The assignments on this point however cannot be sustained. A conclusive answer is given by the learned judge below in the suggestion that as there was in 1882 an admitted debt of appellant to defendant, of $19,336.78, the failure to state an account correctly cannot raise a conclusive presumption of payment. But the learned judge went farther. During the larger part of the period involved the defendant sublet the road, and the judge finds that although the defendant itself did not keep such

detailed and itemized accounts as appellant was entitled to, yet the sublessee did so in regard to nearly all the controverted matters, and from these books the master has in fact stated an account between appellant and defendant. While the master did not regard the evidence from which he made up his account as itemized or kept strictly as the law required, yet it has not been shown that it was not a substantial basis for an accounting, and it should be said further that its inadequacy was to some extent the appellant's own fault. Accounts were rendered by defendant to appellant from time to time during the running of the lease, and while the latter complained that they were not such as it was entitled to, yet no further effort appears to have been made to get the details while they were current and accessible, and even afterwards during the taking of the testimony under the present bill, the books of the defendant were offered to appellant for examination of the items, but the offer was not taken advantage of. The court was therefore right in refusing to adopt the master's first report.

The learned judge then took up the alternative report and examined the account upon the evidence with great care, coming finally to a conclusion in substantial accord with the master. In so doing he laid down a rule at least sufficiently strict against the defendant. " The standard of duty imposed on the defendant by the agreement of October, 1882, does not differ materially from that imposed on the usual mortgagee in possession. They are bound to account not only for what they actually received but also for what they should and could with reasonable care and attention have received. . . . While the agreement provides that the defendant might charge such rates as might be lawful and might seem best to it for its interests, the spirit of the agreement was that the road should be operated in the interest of both parties." This rule the learned judge appears to have applied consistently throughout his examination of the account. The bone of contention, as he says, was the amount of the gross receipts, which was the agreed measure of the rent. As to amounts actually received there was no serious dispute, but it was claimed that defendant had failed to obtain earnings which it should have done, especially in the years 1885 to 1892. The railroad leased was a short road used principally for the development of lumber territory. In 1885 the sublessee, the

Philadelphia & Reading Railroad Company, surrendered the road to its immediate lessor, the defendant, and the latter leased it to the Spring Brook Lumber Company, but instead of reserving rent at a percentage of actual gross earnings, it substituted a fixed rate per ton of freight carried. The defendant claimed that this was the best and most profitable arrangement it could make ; that the only business the road had was carrying lumber ; that the territory was nearly exhausted ; and that what timber was left was practically under the control of the Lumber Company or its president, Mr. Lewis, who was threatening to extend another road which he controlled into the territory, so that this trade would be diverted, and appellant's road become practically useless. Appellant on the other hand contended that this agreement was in violation of its rights, and that the defendant was bound to maintain both by itself and its sublessees the regular rates. The master found that defendant had departed from the agreement, and he therefore raised the rate upon which the account was to be stated from the thirty cents fixed by the parties to eighty-five cents per ton, which he found was a proper charge for what the defendant should have received from the lumber company. The court held the arrangement between the defendant and the lumber company not binding on the appellant and, after reviewing the evidence on this point, reached the result that the rate fixed by the master was " as fair a conclusion as any other, and a legitimate inference from the evidence." This was at least going as far in favor of the appellant as would be justifiable. There is no power in courts requiring more caution in its exercise than the post facto authority to say after a transaction is concluded how much more profit could have been made than actually was made by the interested parties.

Where a business is conducted by one who is not the exclusive owner, but is accountable in part as a quasi trustee to another, the rule undoubtedly is, as held by the learned court below, that it must be conducted with fair regard to the interest of both parties, and equity will scrutinize closely where there is any reason to suspect fraud, or even any opportunity for unfair advantage. But where as in the present case the interests of both parties are the same, to get the largest rent possible for the property, there is a presumption that the best was done which the circumstances permitted. Rates and prices

must be fixed by the parties who are actually conducting the business and therefore have the requisite knowledge. No business can be successfully managed in any other way, and in this case it was expressly agreed in the lease, that the defendant "may charge for transportation on the said railroad and its branches, any such rates as may be lawful, and as may seem best to it for its own interest," and shall set aside twenty per cent of the gross receipts for payment of the taxes, liens, etc., and the reduction of the mortgage debt. It is thus clear that the better the terms of the sublease were for the defendant the better they would also be for the appellant, and when therefore the defendant considered it was doing the best it could for itself in the arrangement with the lumber company there is a strong presumption that it was using its judgment equally for the interest of the appellant. It may be doubted whether, if the question were before us in the first instance, we should find the evidence sufficient to overcome this presumption. But the master and the court below have concurred in their conclusions, the defendant is not here complaining, and the appellant certainly has nothing to complain of.

Decree affirmed with costs.